FILED

2014 DEC 22  PM 1:41

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:

STEPHEN YAGMAN
475 Washington Boulevard
Venice Beach, California 90292-5287
(310) 452-3200

Presented on behalf of
STEPHEN YAGMAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES *ex rel.* STEPHEN YAGMAN,<br><br>Plaintiff,<br><br>v.<br><br>JAMES ELMER MITCHELL, JOHN BRUCE JESSEN, MITCHELL JESSEN and ASSOCIATES and **affiliates or corporate entities**, each and all in their former official capacities and in their present individual capacities, GEORGE JOHN TENET, PORTER JOHNSTON GOSS, MICHAEL VINCENT HAYDEN, JOHN CHOON YOO, WILLIAM JAMES HAYNES, II, IRVING LEWIS LIBBY, JR., DAVID SPEARS ADDINGTON, JOSE A. RODRIGUEZ, JR., JOHN A. RIZZO, SCOTT MULLER, all in their former official capacities only, UNITED STATES OF AMERICA CENTRAL INTELLIGENCE AGENCY, UNITED STATES OF AMERICA, and UNKNOWN NAMED DEFENDANTS 1-100,<br><br>Defendants. | CV 14 - 09771 - JFW (MANx)<br><br>**COMPLAINT**<br><br>**REQUEST FOR JURY** |

PAID

22

Clerk, US District Court
COURT 4612

1

Plaintiff, on information and belief, alleges:

## JURISDICTION AND VENUE

1.    This is an action for making false claims, in violation of 31 U.S.C. § 3729, and this court has jurisdiction of this action pursuant to 31 U.S.C. § 3730(b) and 42 U.S.C. § 1343.

2.    Venue lies in this district pursuant to 28 U.S.C. § 1391.

## THE PARTIES

3.    The United States of America is the name of the government of America and plaintiff relator, Stephen Yagman, who is a citizen thereof, brings the action on its behalf, pursuant to 31 U.S.C. § 3730(b)(1). Neither relator nor the United States knew or reasonably should have known facts material to the right of action until after January 1, 2014.

4.    Defendants are: James Elmer Mitchell and John Bruce Jessen, individuals, along with Mitchell Jessen and Associates and affiliated companies and/or corporate entities; George John Tenet, who was director of Central Intelligence Agency ("CIA") from December 15, 1996 to July 11, 2004; Porter Johnston Goss, who was director of CIA from September 24, 2004 to May 5, 2006; Michael Vincent Hayden, who was director of CIA from May 30l, 2006 to February 12, 2009, each sued only in their former official capacities and under color of law, as officers and employees of the United States and CIA and under color of law; John Choon Yoo, deputy assistant attorney general, 2001-03, William James Haynes, II, general counsel to Department of Defense, May 24, 2001-March 10, 2008, Irving Lewis Libby, Jr., chief of staff to Dick Cheney, 2001-October 28, 2005, David Spears Addington, legal counsel to, January 5, 2002-November 1, 2005, and chief of staff, November 1, 2005-January 20, 2009, to Dick Cheney, Jose A. Rodriguez, Jr., John A. Rizzo, deputy counsel, 2001-02, and acting general counsel to CIA, 2004-09, Scott Muller, general counsel to CIA,

2002-04, all sued only in their former official capacities as officers and employees of the United States, the Justice Department Department CIA, and/or an agency of the United States, and under color of law, and the United States; Unknown Named Defendants who are sued only in their former official capacities as officers and employees of the United States and/or an agency thereof and under color of law, along with the United States, all of whom engaged the wrongful conduct set forth hereinbelow and in Exhibits 1 and 2 hereto.

## FACTS COMMON TO ALL COUNTS

5.     Each and every allegation set forth in each and every averment of this pleading, and in the Exhibits thereto, hereby is incorporated by this reference in each and every other averment and allegation of this pleading.

6.     All acts and/or omissions perpetrated by each defendant, were engaged in maliciously, callously, oppressively, wantonly, recklessly, with deliberate indifference to the rights allegedly violated, despicably, and with evil motive and/or intent, in disregard of federal and international law.

7.     Each defendant presented and/or caused to be prevented and/or facilitated in or aided and abetted false and/or fraudulent claims for payment and/or approval to the United States, and/or knowingly made, used, caused to be made and/or used false records or statements material to a false and/or fraudulent claim, made and/or delivered a receipt without completely knowing that the information on the receipt was true, and/or conspired to do so, as set forth more fully hereinbelow, and in Exhibits 1 and 2 hereto, and is liable to the United States Government for a civil penalty of not less than the amount of the fraudulent claim, and which currently appears to be $81,000,000.00, and also for not less than $5,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, plus three times the amount of actual damages sustained, plus costs of suit, pursuant to 31 U.S.C. § 3729,

1       8.    Each defendant knowingly, or grossly negligently, or with deliberate

2   indifference to the rights allegedly violated, caused to come into being,

3   maintained, fostered, condoned, approved of, either before the fact or after the

4   fact, ratified, took no action to correct, an official policy, practice, procedure, or

5   custom of permitting the occurrence of the categories of wrongs set forth in this

6   pleading, and/or improperly, inadequately, with deliberate indifference to law,

7   grossly negligently, with reckless disregard to law accepted science, accepted law,

8   and common sense, failed properly to train, to supervise, to retrain, if necessary, to

9   monitor, or to take corrective action with respect to the types of wrongful conduct

10   alleged in this pleading, so that each one of them is legally responsible for all of

11   the injuries and/or damages sustained.

**WRONGS ALLEGED**

13       9.    Defendants and each of them solicited and/or provided and/or

14   participated in some way in encouragement for Mitchell and Jessen and their

15   companies to justify torture and to provide services to torture captives held by the

16   United States Government, in violation of both United States and international

17   law. Specifically, Yoo and Haynes authored and/or provided false legal

18   memoranda as rationales for the torture inflicted.

19       10.    The bases, justifications, and legal rationales for torture were

20   materially false, and based on them Mitchell, Jessen, and their companies were

21   paid at least $81 million, that was defrauded from the Government.

22       11.    The information and bases for relator's claims are set forth in the

23   New York *Times* and *Time Magazine* articles and opinion attached hereto

24   collectively as Exhibit 1 and in Senate Select Committee on Intelligence

25   *Committee Study of the Central Intelligence Agency's Detention and Interrogation*

26   *Program* Finding and Conclusions Executive Summary, dated December 3, 2014,

27   the cover page of which is attached hereto as Exhibit 2, all of whose contents are

28   incorporated herein by this reference.

1    **WHEREFORE**, relief is requested as follows:

2    1.    Damages sustained by the Government;

3    2.    Trebling of damages sustained by the Government;

4    3.    Imposition of a civil penalty of not less than $5,000.00;

5    4.    Interest on any judgment;

6    5.    Costs of suit;

7    6.    Attorneys' fees;

8    7.    Relator percentage of the proceeds of the action, or of any

9    settlement thereof, according to law; and,

10    8.    Such other relief as may be just and proper.

11    **JURY DEMAND**

12    Trial by jury is demanded.

13

14

15

16    **STEPHEN YAGMAN**

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **<u>EXHIBIT 1</u>**

Case 2:14-cv-09771-DMG-PJW   Document 1   Filed 12/22/14   Page 7 of 29   Page ID
Prosecute Torturers and Their Boss - NYTimes.com #:7
Page 2 of 3

that the United States ratified in 1994 and that requires prosecution of any acts of torture.

So it is no wonder that today's blinkered apologists are desperate to call these acts anything but torture, which they clearly were. As the report reveals, these claims fail for a simple reason: C.I.A. officials admitted at the time that what they intended to do was illegal.

In July 2002, C.I.A. lawyers told the Justice Department that the agency needed to use "more aggressive methods" of interrogation that would "otherwise be prohibited by the torture statute." They asked the department to promise not to prosecute those who used these methods. When the department refused, they shopped around for the answer they wanted. They got it from the ideologically driven lawyers in the Office of Legal Counsel, who wrote memos fabricating a legal foundation for the methods. Government officials now rely on the memos as proof that they sought and received legal clearance for their actions. But the report changes the game: We now know that this reliance was not made in good faith.

No amount of legal pretzel logic can justify the behavior detailed in the report. Indeed, it is impossible to read it and conclude that no one can be held accountable. At the very least, Mr. Obama needs to authorize a full and independent criminal investigation.

The American Civil Liberties Union and Human Rights Watch are to give Attorney General Eric Holder Jr. a letter Monday calling for appointment of a special prosecutor to investigate what appears increasingly to be "a vast criminal conspiracy, under color of law, to commit torture and other serious crimes."

The question everyone will want answered, of course, is: Who should be held accountable? That will depend on what an investigation finds, and as hard as it is to imagine Mr. Obama having the political courage to order a new investigation, it is harder to imagine a criminal probe of the actions of a former president.

But any credible investigation should include former Vice President Dick Cheney; Mr. Cheney's chief of staff, David Addington; the former C.I.A. director George Tenet; and John Yoo and Jay Bybee, the Office of Legal Counsel lawyers who drafted what became known as the torture memos. There are many more names that could be considered, including Jose Rodriguez Jr., the C.I.A. official who ordered the destruction of the videotapes; the psychologists who devised the torture regimen; and the C.I.A. employees who carried out that regimen.

One would expect Republicans who have gone hoarse braying about Mr. Obama's executive overreach to be the first to demand accountability, but with one notable exception, Senator John McCain, they have either fallen silent or actively defended the indefensible. They cannot even point to any results: Contrary to repeated claims by the C.I.A., the report concluded that "at no time" did any of these techniques yield intelligence that averted a terror attack. And at least 26 detainees were later determined to have been "wrongfully held."

Starting a criminal investigation is not about payback; it is about ensuring that this never happens again and regaining the moral credibility to rebuke torture by other governments. Because of the Senate's report, we now know the distance officials in the executive branch went to rationalize, and conceal, the crimes they wanted to commit. The question is whether the nation will stand by and allow the perpetrators of torture to have perpetual immunity for their actions.

Meet The New York Times's Editorial Board »

A version of this editorial appears in print on December 22, 2014, on page A26 of the New York edition with the headline: Prosecute Torturers and Their Bosses.

© 2014 The New York Times Company

Prosecute Torturers and Their Bosses } NYTimes.com

NYTimes.com no longer supports Internet Explorer 8 or earlier. Please upgrade your browser. LEARN
MORE »

**The New York Times** | http://nyti.ms/1vf2dF1  

The Opinion Pages | EDITORIAL

# Prosecute Torturers and Their Bosses

By THE EDITORIAL BOARD   DEC. 21, 2014

Since the day President Obama took office, he has failed to bring to justice
anyone responsible for the torture of terrorism suspects — an official government
program conceived and carried out in the years after the attacks of Sept. 11, 2001.

He did allow his Justice Department to investigate the C.I.A.'s destruction of
videotapes of torture sessions and those who may have gone beyond the torture
techniques authorized by President George W. Bush. But the investigation did not
lead to any charges being filed, or even any accounting of why they were not filed.

Mr. Obama has said multiple times that "we need to look forward as opposed to
looking backwards," as though the two were incompatible. They are not. The nation
cannot move forward in any meaningful way without coming to terms, legally and
morally, with the abhorrent acts that were authorized, given a false patina of legality,
and committed by American men and women from the highest levels of government
on down.

Americans have known about many of these acts for years, but the 524-page
executive summary of the Senate Intelligence Committee's report erases any
lingering doubt about their depravity and illegality: In addition to new revelations of
sadistic tactics like "rectal feeding," scores of detainees were waterboarded, hung by
their wrists, confined in coffins, sleep-deprived, threatened with death or brutally
beaten. In November 2002, one detainee who was chained to a concrete floor died of
"suspected hypothermia."

These are, simply, crimes. They are prohibited by federal law, which defines
torture as the intentional infliction of "severe physical or mental pain or suffering."
They are also banned by the Convention Against Torture, the international treaty

NYTimes.com no longer supports Internet Explorer 8 or earlier. Please upgrade your browser. LEARN
MORE »

**The New York Times** | http://nyti.ms/1uhPzVa



The Opinion Pages | EDITORIAL

# The Senate Report on the C.I.A.'s Torture and Lies

By THE EDITORIAL BOARD    DEC. 9, 2014

The world has long known that the United States government illegally detained and tortured prisoners after the terrorist attacks of Sept. 11, 2001, and lied about it to Congress and the world. But the summary of a report released Tuesday of the Senate investigation of these operations, even after being sanitized by the Central Intelligence Agency itself, is a portrait of depravity that is hard to comprehend and even harder to stomach.

The report raises again, with renewed power, the question of why no one has ever been held accountable for these seeming crimes — not the top officials who set them in motion, the lower-level officials who committed the torture, or those who covered it up, including by destroying videotapes of the abuse and by trying to block the Senate Intelligence Committee's investigation of their acts.

At one point, the report says, the C.I.A. assured Congress that the behavior of the secret jailers and interrogators was nothing like the horrors the world saw at the Abu Ghraib prison in Iraq. That was the closest the agency seems to have come to the truth — what happened appears to have been worse than what took place at Abu Ghraib.

The Senate committee's summary says that the torture by C.I.A. interrogators and private contractors was "brutal and far worse" than the agency has admitted to the public, to Congress and the Justice Department, even to the White House. At least one detainee died of "suspected hypothermia" after being shackled partially naked to a concrete floor in a secret C.I.A. detention center run by a junior officer without experience, competence or supervision. Even now, the report says, it's not clear how many prisoners were held at this one facility, or what was done to them.

☐

In that, and other clandestine prisons, very often no initial attempt was made to question prisoners in a nonviolent manner, despite C.I.A. assertions to the contrary. "Instead, in many cases the most aggressive techniques were used immediately, in combination and nonstop," according to the summary of the declassified and heavily censored document. "Sleep deprivation involved keeping detainees awake for up to 180 hours, usually standing or in stress positions, at times with their hands shackled above their heads."

Detainees were walked around naked and shackled, and at other times naked detainees were "hooded and dragged up and down a long corridor while being slapped and punched."

The C.I.A. appears to have used waterboarding on more than the three detainees it has acknowledged subjecting to that form of torture. During one session, one of those detainees, Abu Zubaydah, an operative of Al Qaeda, became "completely unresponsive." The waterboarding of another, Khalid Shaikh Mohammed, the self-described planner of the 9/11 attacks, became a "series of near drownings."

Some detainees, the report said, were subjected to nightmarish pseudo-medical procedures, referred to as "rectal feeding."

That some of these detainees were highly dangerous men does not excuse subjecting them to illegal treatment that brought shame on the United States and served as a recruiting tool for terrorist groups. To make matters worse, the report said that at least 26 of the 119 known C.I.A. prisoners were wrongfully held, some of them for months after the C.I.A. determined that they should not have been taken prisoner in the first place.

☐

The C.I.A. and some members of the President George W. Bush's administration claimed these brutal acts were necessary to deal with "ticking time bomb" threats and that they were effective. Former Vice President Dick Cheney, an avid promoter of "enhanced interrogation," still makes that claim.

But "at no time" did the C.I.A.'s torture program produce intelligence that averted a terrorism threat, the report said. All of the information that the C.I.A. attributed to its "enhanced interrogation techniques" was obtained before the brutal interrogations took place, actually came from another source, or was a lie invented

by the torture victims — a prospect that the C.I.A. had determined long ago was the likely result of torture.

The report recounted the C.I.A.'s decision to use two outside psychologists "to develop, operate and assess" the interrogation programs. They borrowed from their only experience — an Air Force program designed to train personnel to resist torture techniques that had been used by American adversaries decades earlier. They had no experience in interrogation, "nor did either have specialized knowledge of Al Qaeda, a background in counterterrorism or any relevant cultural or linguistic expertise."

They decided which prisoners could withstand brutal treatment and then assessed the effectiveness of their own programs. "In 2005, the psychologists formed a company specifically for the purpose of conducting their work with the C.I.A. Shortly thereafter, the C.I.A. outsourced virtually all aspects of the program," the summary said. And it noted that, "the contractors received $81 million prior to the contract's termination in 2009."

The litany of brutality, lawlessness and lack of accountability serves as a reminder of what a horrible decision President Obama made at the outset of his administration to close the books on this chapter in our history, even as he repudiated the use of torture. The C.I.A. officials who destroyed videotapes of waterboarding were left unpunished, and all attempts at bringing these acts into a courtroom were blocked by claims of national secrets.

It is hard to believe that anything will be done now. Republicans, who will soon control the Senate and have the majority on the intelligence panel, denounced the report, acting as though it is the reporting of the torture and not the torture itself that is bad for the country. Maybe George Tenet, who ran the C.I.A. during this ignoble period, could make a tiny amends by returning the Presidential Medal of Freedom that President Bush gave him upon his retirement.

Meet The New York Times's Editorial Board »

A version of this editorial appears in print on December 10, 2014, on page A34 of the New York edition with the headline: A Record of Torture and Lies .

© 2014 The New York Times Company

# The New York Times

ARTHUR OCHS SULZBERGER JR., *Publisher, Chairman*

# Dark Again After the Torture Report

We have not always agreed with Senator Dianne Feinstein on national security issues like wiretapping, but the California Democrat who heads the Senate Intelligence Committee has displayed commitment and courage in the investigation of the illegal detention, abuse and torture of prisoners by the Central Intelligence Agency.

Realizing she had one last chance to get this report to the public before Republicans take over the Senate, Ms. Feinstein released a summary of the findings despite heavy pressure from Republicans and the White House to withhold it. She and her aides deserve enormous credit for their five-and-a-half-year struggle.

Sadly, that is pretty much it on the disclosure front. In post-9/11 America, when it comes to momentous matters of national security, democratic tradition and the rule of law, there is precious little disclosure and no justice and accountability. It's a bipartisan affliction.

Employees of the C.I.A., and the military, as well as private contractors, illegally detained, tortured and abused prisoners — most of them really dangerous men, but also some who should never have been detained. None of them should have been dealt with in such a shameful and evidently unlawful way.

The jailers and torturers acted on orders that descended from President George W. Bush, Vice President Dick Cheney, C.I.A. chief George Tenet and Defense Secretary Donald Rumsfeld, among others. They justified their action with twisted legal memos arguing that torture was not torture when the president wanted to do it.

C.I.A. officers destroyed the videotaped evidence of waterboarding, which for eons was considered to be torture until the Bush administration decided it could be inflicted on Muslim prisoners. The Justice Department, under President Obama, did investigate both the prisoners' debasement and the destruction of evidence but decided not to file criminal charges.

Under Mr. Bush, foreign citizens with no connection to terrorism were snatched from the streets and, on one occasion, from Kennedy International Airport in New York. They were bound, gagged, blindfolded and flown off to countries that commit even more hideous acts of torture than the ones the C.I.A. seemed to prize so highly. The United States knew, of course, that it would happen; it was the point of sending the prisoners to those countries in the first place.

No one was held accountable. When the prisoners were finally set free, their bodies broken and their lives ruined (one was dropped on a remote road in a lonely part of Europe where nobody spoke his language and had to make his way home to a family that had long thought him dead), the United States rolled out its legal guns to make sure that no court ever heard their cases. The excuse was

national security. The real reason was that if these stories were told in public, it would be hideously embarrassing to the government.

That policy of concealment continued into the Obama administration, with perhaps even greater zeal than under Mr. Bush. To this day, the United States government will not even acknowledge these abductions, much less apologize or provide compensation.

The Justice Department did not investigate the torture and detention under Mr. Bush; it approved them. President Obama wanted to "look forward" to his own political agenda, so he ruled out making any public inquiry or hearings. Court cases continued to be shut down before a word could be argued; officials who spoke to the press about this and other issues like wiretapping have been prosecuted, along with reporters themselves, with a disturbing enthusiasm.

The Justice Department did start investigating the destruction of the videotapes in 2007, and in 2009, expanded the probe to include broader issues of detention and interrogation. But of course, it was all in secret, and the Senate Intelligence Committee's Democratic members found that they couldn't interview anyone because Justice's go-nowhere investigation prevented it.

Meanwhile, the C.I.A. made a Nixonian effort to stymie Senate investigators because they had stumbled across the internal review of detention and interrogation. News accounts suggest the report was devastating, but the administration never intended to make it public. Even now, the Justice Department is fighting an effort by The Times to compel disclosure of its own investigation.

We can't say that no one was punished for abusing prisoners. There were the low-level personnel at Abu Ghraib, for instance, and one former C.I.A. officer connected to the interrogation program is in prison. His name is John Kiriakou. He was prosecuted for being a whistle-blower.

We cannot say, either, that the C.I.A. won't even address these issues. The head of the agency, John Brennan, held a news conference Thursday at which he acknowledged that pretty much all the forms of brutality listed in the Senate report had occurred at C.I.A. prisons.

Then, in a moment of black comedy, he offered the usual excuse that it was fine because administration lawyers had found a way to make it seem legal. "I will leave to others how they might want to label those activities," he said.

Mr. Brennan's lack of interest in further discussion was fairly clear. "My fervent hope is that we can put aside this debate and move forward," he said.

Unhappily, he's likely to get his wish.

NYTimes.com no longer supports Internet Explorer 8 or earlier. Please upgrade your browser. LEARN MORE »

**The New York Times**   http://nyti.ms/12ELALb



POLITICS

# Amid Details on Torture, Data on 26 Who Were Held in Error

By SCOTT SHANE   DEC. 12, 2014

One quiet consequence of this week's sensational release of the Senate Intelligence Committee's report on the C.I.A. detention program was a telephone call that a human rights lawyer, Meg Satterthwaite, placed to a client in Yemen, Mohamed Bashmilah.

For eight years since Mr. Bashmilah, 46, was released from C.I.A. custody, Ms. Satterthwaite and other advocates had been trying without success to get the United States government to acknowledge that it had held him in secret prisons for 19 months and to explain why. In the phone call on Wednesday, she told him that the Senate report listed him as one of 26 prisoners who, based on C.I.A. documents, had been "wrongfully detained."

"Na'am," he answered simply in Arabic. "Yes." He said he had had faith that someday his ordeal would be acknowledged. Then he thanked the lawyers who have taken up his case over the years, Ms. Satterthwaite said.

Mr. Bashmilah has told them of being tortured in Jordan before he was handed over to the C.I.A., which at times kept him shackled alone in freezing-cold cells in Afghanistan, subjected to loud music 24 hours a day. He attempted suicide at least three times, once by saving pills and swallowing them all at once; once by slashing his wrists; and once by trying to hang himself. Another time he cut himself and used his own blood to write "this is unjust" on the wall.

After learning the news, Mr. Bashmilah pressed Ms. Satterthwaite, who heads the global justice program at New York University Law School, to tell him what

might follow from the Senate's recognition. Would there be an apology? Would there be some kind of compensation?

While the gruesome details of torture and the dispute over its results have drawn the greatest media coverage, the Senate report also represents the fullest public account by any branch of government of the C.I.A.'s secret prison program. It exposes some of the mistakes made in the agency's rush to grab people with possible links to Al Qaeda in the first years after the terrorist attacks of Sept. 11, 2001.

Until 9/11, the United States had officially condemned secret imprisonment as a violation of the basic international standards of human rights. But like the prohibition on torture, it was set aside in the frantic effort to stop another attack.

The Senate Democratic staff members who wrote the 6,000-page report counted 119 prisoners who had been in C.I.A. custody. Of those, the report found that 26 were either described in the agency's own documents as mistakenly detained, or released and given money, evidence of the same thing.

The C.I.A. told the Senate in its formal response that the real number of wrongful detentions was "far fewer" than 26 but did not offer a number. Human rights advocates who have tracked the C.I.A. program believe that considerably more than 26 were wrongfully detained. Another Yemeni client of Ms. Satterthwaite, for instance, Mohammed al-Asad, was left out of the Senate's count, even though he languished for months in C.I.A. prisons without being questioned, was sent home to Yemen and was never charged with a terrorism-related crime.

"The U.S. caused a great deal of suffering to people who posed no threat," said Anne FitzGerald, director of research and crisis response at Amnesty International, who visited Yemen eight times to talk to Mr. Bashmilah, Mr. Asad and others who appeared to be former C.I.A. detainees. "International standards are there for a reason — they protect everyone."

Among those that the report found to have been wrongfully imprisoned were some whose cases had already drawn public attention. Khaled el-Masri, a German citizen, was mistaken for someone with the same name, grabbed in Macedonia and flown to Afghanistan, where he spent four months in the C.I.A. jail known as the Salt Pit. Laid Saidi, an Algerian, identified in the Senate report as Abu Hudhaifa, was held in Afghanistan for 16 months, and his case became the subject of a New York Times article in 2006 after Mr. Masri called it to public attention.

The Senate report says that Mr. Saidi "was subjected to ice water baths and 66 hours of standing sleep deprivation before being released because the C.I.A. discovered he was not the person he was believed to be."

Among the others mistakenly held for periods of months or years, according to the report, were an "intellectually challenged" man held by the C.I.A. solely to pressure a family member to provide information; two people who were former C.I.A. informants; and two brothers who were falsely linked to Al Qaeda by Khalid Shaikh Mohammed, the 9/11 planner, who "fabricated" the information after being waterboarded 183 times.

In addition, the report says, "C.I.A. records provide insufficient information to justify the detention of many other detainees."

"Detainees often remained in custody for months after the C.I.A. determined that they did not meet the MON standard," the report says, referring to the secret "Memorandum of Notification" signed by President George W. Bush six days after 9/11. It authorized the detention of "persons who pose a continuing, serious threat of violence or death to U.S. persons and interests or who are planning terrorist activities."

In practice, the report says, many prisoners were seized by C.I.A. rendition teams or turned over by friendly foreign intelligence agencies based on thin evidence. In some cases, the complications of Arabic names caused further confusion: Mr. Bashmilah, for instance, is identified in the Senate report as "Mohammad al-Shomaila," a variation of his name with a different transliteration and without the "Ba" prefix common in Yemeni names.

"You have an agency that has been presenting itself to Congress and the public as very professional, on top of everything," said John Sifton, an advocacy director at Human Rights Watch. "The report shows they were flying by the seat of their pants. They were making it up as they went along."

In fact, the agency has admitted to a degree of chaos and blundering in the early months of the program. But its formal response to the Senate report argues that capturing someone who was sincerely believed to be dangerous should not be counted as "wrongful," even if the suspicions turned out to be groundless.

"The fact that the intelligence case for detaining an individual is later shown to be less powerful than originally thought does not, in itself, render the original reasonably well-founded decision to detain 'wrongful,' " the C.I.A. response says. An

intelligence official who spoke of the classified program on the condition of anonymity added that "the vast majority of those detained in C.I.A.'s program were committed terrorists," but "in the few instances where we determined that the detainee in custody did not meet the standards for detention, C.I.A.'s general practice was to release that person and compensate him with cash."

There was no cash in Mr. Bashmilah's case. Originally from Aden, Yemen, he had a small import-export business in Indonesia in 2003, when he traveled to Jordan with his wife to meet his mother and give her the money for heart surgery. But in Amman, he was arrested by the Jordanian authorities, who were suspicious about the new passport he held and his admission that he had once traveled to Afghanistan.

The Jordanians hung him upside down and beat him in three weeks of imprisonment before turning him over in the middle of the night to C.I.A. officers. There followed 19 months of solitary confinement in two secret prisons in Afghanistan, which he told Salon in 2007 was worse than physical torture.

"Whenever I saw a fly in my cell, I was filled with joy," he said. "Although I would wish for it to slip from under the door so it would not be imprisoned itself."

Then he was returned to Yemen and held there, reportedly at the Americans' request. After nine more months, he was convicted of forgery based on an allegedly fake travel document that was not presented in court and sentenced to time served, according to an Amnesty International report.

Ms. Satterthwaite was not able to answer Mr. Bashmilah's question about an apology or reparation. No apology was forthcoming from the C.I.A., which declined to comment on specific cases. A lawsuit filed by the American Civil Liberties Union on behalf of Mr. Bashmilah and others flown to prisons on C.I.A. aircraft against an agency contractor, Jeppesen Dataplan Inc., was dismissed on the grounds that it might expose state secrets. Whether the Senate report's release will change such legal calculations is uncertain.

A version of this article appears in print on December 13, 2014, on page A1 of the New York edition with the headline: Amid Details on Torture, Data on 26 Held in Error.

© 2014 The New York Times Company

Case 2:14-cv-09771-DMG-PJW   Document 1   Filed 12/22/14   Page 18 of 29   Page ID
#:18
Ex-Chief Leads Vocal Defense of C.I.A. - NYTimes.com                                    Page 1 of 4

NYTimes.com no longer supports Internet Explorer 8 or earlier. Please upgrade your browser. LEARN
MORE »

**The New York Times** | http://nyti.ms/1zKDhu5



POLITICS

# Ex-Chief Leads Vocal Defense of C.I.A.

By SHERYL GAY STOLBERG and ERIC LICHTBLAU   DEC. 12, 2014

WASHINGTON — The last time George Tenet was asked about torture on
television, he sounded defiant and jabbed his finger in the air. The year was 2007,
and Mr. Tenet, the former director of the Central Intelligence Agency, was
promoting his memoir when a question about waterboarding came up while he was
being interviewed on CBS' "60 Minutes."

"You know, the image that's been portrayed is we sat around the campfire and
said, 'Oh boy, now we go get to torture people,' " Mr. Tenet said, growing angry as
the newsman Scott Pelley challenged him on how the agency interrogated terrorism
suspects. "We don't torture people. Let me say that again to you, we don't torture
people. O.K.?"

This week the Senate Intelligence Committee issued a long-awaited report
detailing the gruesome interrogation techniques employed by the C.I.A. on Mr.
Tenet's watch as well as the false claims the agency made about their effectiveness.
But Mr. Tenet, now a managing director of a secretive New York investment bank,
has been nowhere in public view, leaving it to one of his successors — Michael V.
Hayden, who was much less involved with the brutal interrogation program — to
serve as the C.I.A.'s most vocal defender.

While Mr. Hayden has been all over television this week, Mr. Tenet has
responded only in writing. But they are working in concert; their disparate
approaches are part of an orchestrated campaign by the two former directors — and
a third, Porter J. Goss — to defend the agency they all worked for by attacking the
report's credibility.

Other former Bush administration officials — notably former Vice President Dick Cheney — have also defended the C.I.A., but Mr. Hayden, who served as C.I.A. director from 2006 to 2009 and whose folksy manner makes for lively quotes, has emerged as their smoothest — and most willing — spokesman.

"He's always been a great communicator, he has a way of turning a phrase, he's very energetic and willing to engage and we're lucky to have him on our team," said Bill Harlow, a former C.I.A. official who is acting as the spokesman for Mr. Tenet and helping coordinate the response effort. "When it comes to TV it's hard to match him."

That effort, which includes a new website, began even before the committee issued its report on the agency's harsh treatment of detainees. But while defending the agency on the airwaves and in print interviews, Mr. Hayden has also taken pains to point out — with a heavy dose of outrage — that he assumed the directorship of the C.I.A. after the worst abuses documented by the committee occurred, and then briefed the panel on the program.

"Everything here happened before I got there, and I'm the one she condemns on the floor of the Senate?" he said in an interview with Politico, referring to Senator Dianne Feinstein, the committee chairwoman. "Gee, how'd that happen?"

He went on: "I'm the dumb son of a bitch who went down and tried to lay out this program in great detail to them. I'm mentioned twice as much in there as George Tenet — but George and Porter Goss had 97 detainees during their tenure, while I had two."

Mr. Hayden did not respond to an email request to comment for this article.

The 61-year-old Mr. Tenet, a camera-shy son of Greek immigrants from Queens, began his career in Washington as a congressional aide and rose to become the nation's youngest C.I.A. director. He served from 1997 to 2004, under Presidents Bill Clinton and George W. Bush, and led the agency in the wake of the 9/11 attacks during the most intense phase of the interrogations.

The committee report presents a devastating description of the way the C.I.A. was run in that period, detailing what it said was an agency that was unprepared to take on the task of interrogating suspects from Al Qaeda and was deceitful in describing the results. Mr. Tenet is depicted in the Senate report as largely removed from the actual management of the interrogation program. The report notes, for instance, that although Mr. Tenet issued guidelines for using the brutal tactics in

report, Mr. Hayden told a C.I.A. aide to "keep the detainee number at 98" in agency reports, even though the actual number of prisoners was at least 112.

While Mr. Harlow insisted there was no coordinated media strategy, Matthew Miller, a crisis-management strategist in Washington who worked as the Justice Department spokesman early in the Obama administration, said it was a "pretty smart move" by the ex-C.I.A. officials to make Mr. Hayden their point man, rather than Mr. Tenet.

"If you get Tenet on TV," he said, "he has to answer a bunch of questions about what he knew, and he has more to answer for."

In an interview this week with Katty Kay of the BBC, Mr. Hayden basically said as much.

"Most of this stuff I didn't do, most of this stuff came before me," he said, adding, "So I guess that's why I'm here. I think most people view me to be a slightly more objective judge to the program than the individuals that actually conducted it."

But whether the public relations offensive is changing any minds remains an open question. "To what extent we have an impact, I don't know," Mr. Harlow said Friday, "but we've got to try."

A version of this article appears in print on December 13, 2014, on page A1 of the New York edition with the headline: Ex-Chief Leads Vocal Defense of Spy Agency.

© 2014 The New York Times Company

NYTimes.com no longer supports Internet Explorer 8 or earlier. Please upgrade your browser. LEARN
MORE »

**The New York Times**    http://nyti.ms/1AOkWsU

POLITICS

# C.I.A., on Path to Torture, Chose Haste Over A... 

By JAMES RISEN and MATT APUZZO    DEC. 15, 2014

WASHINGTON — Almost immediately after transferring the first important prisoner they had captured since the 9/11 attacks to a secret prison in Thailand, officials of the Central Intelligence Agency met at the agency's headquarters to debate two questions they had been discussing for months. Who would interrogate Abu Zubaydah, and how?

A C.I.A. lawyer at the April 1, 2002, meeting suggested the name of a psychologist, James Mitchell, who had been on contract for several months, analyzing Al Qaeda for the agency's Office of Technical Service, the arm of the C.I.A. that creates disguises and builds James Bond-like spy gadgets.

The lawyer, Jonathan Fredman, had heard the name from someone in the office, and within hours of floating it, counterterrorism officials were on the phone with Mr. Mitchell. By that evening, according to the report released last week by the Senate Intelligence Committee, the agency had incorporated Mr. Mitchell's views into a classified cable ordering preparations for the interrogation of Abu Zubaydah, a Qaeda operative.

The cable called for constant lighting, loud music and an all-white room to keep Abu Zubaydah awake. The setup would cause "psychological disorientation, and reduced psychological wherewithal," the cable read.

With little debate or vetting of Mr. Mitchell and his approach, the C.I.A. that day in 2002 started down a road to interrogation practices that Senator Dianne Feinstein, the chairman of the Intelligence Committee, last week called "a stain on our values and our history."

In the months that followed, Mr. Mitchell, a former Air Force explosives expert and trainer, and later his partner, Bruce Jessen, another psychologist and former Air Force officer, designed, led and directed the interrogations and became the prime advocates for what is now widely considered to have been torture. In the process, they made tens of millions of dollars under contracts that their critics within the C.I.A. warned at the time gave them financial incentives to repeatedly use the most brutal techniques.

The C.I.A. has said it hired Mr. Mitchell and Mr. Jessen because their experience with "nonstandard" interrogation was "unparalleled." But the government's own experts favored the traditional approach to questioning prisoners. And the Senate report makes clear that the speed with which Mr. Mitchell was brought into the program — less than 24 hours elapsed between the time his name was floated and that first cable — meant there was no time to analyze whether his approach was best.

Former officials involved in the program attribute the speed to one thing: desperation. With the C.I.A. under pressure to obtain information from its prisoners, Mr. Mitchell seemed to have the answer to how to do it.

That eagerness for a new, aggressive approach is reflected elsewhere in the Senate report. One C.I.A. officer said the agency's best intelligence justifying harsh interrogations came from a "walk-in" source — someone who appeared one day and told the C.I.A. that Allah permitted jihadists to cooperate only if they were threatened. There is no evidence in the report that the C.I.A. ever corroborated those assertions.

In a lengthy interview last week after the C.I.A. released him from an order forbidding his talking about his role in its program, Mr. Mitchell said the speed of his hiring was a surprise even to him. "I never knew how that happened," he said. "I just got a phone call."

But, he said, it was not something he sought. "I didn't knock on the gate and say, 'Let me torture people,' " he said.

Mr. Mitchell added that he disagreed with the conclusions of the Senate report and believes he has been unfairly demonized. His role, he said, was more complicated than has been presented.

Mr. Mitchell and Mr. Jessen had worked as trainers at the Air Force Survival, Evasion, Resistance and Escape (SERE) program, which subjected American airmen

to the kind of interrogation they might face if captured so they could learn to resist it. Building on that experience, Mr. Mitchell proposed to the C.I.A. a list of so-called enhanced interrogation tactics, including locking people in cramped boxes, shackling them in painful positions, keeping them awake for a week at a time, covering them with insects, and waterboarding, which simulates drowning and which the United States had considered torture.

Though the earliest mention of these tactics in the Senate report is July 2002, Justice Department documents released years ago show that C.I.A. officials began discussing them within days of the April 1 meeting when Mr. Mitchell was brought aboard. John Rizzo, the agency's top lawyer at the time, also placed those discussions in April in his memoir "Company Man." He described some of the tactics as "sadistic and terrifying" but left it to Justice Department lawyers to decide whether they were legal. They ultimately decided they were.

Shortly after the April 1 meeting, the C.I.A. dispatched Mr. Mitchell to Thailand, where he was to consult on the "psychological aspects" of the interrogation, according to a C.I.A. cable cited in the report. Mr. Mitchell's original contract with the agency had been to study Al Qaeda's strategies for resisting interrogation. Later, Mr. Mitchell personally waterboarded Abu Zubaydah in Thailand. But Mr. Mitchell said that at first, his job was to observe Abu Zubaydah's interrogation and assess whether he was using the Qaeda techniques.

"I was making recommendations to a team who were doing the interrogation," he said. "But there was intense pressure for results. There was a tremendous amount of pressure not to let other Americans die."

That summer, as Justice Department lawyers and the White House finalized the legal memos justifying the interrogations, Mr. Mitchell said he gave a presentation outlining an aggressive approach. He disputes the notion that he pushed the agency down a road it did not want to go. "It was clear to me from walking the halls that they were going to use coercive interrogations," he said. "It was clear that was the direction they were going."

The SERE techniques, he said, were an attempt to standardize the interrogation process and bolster it with research. "I said, if you are going to use coercive techniques, then don't let people just freelance," Mr. Mitchell recalled. "Use something that people have a track record with."

C.I.A., on Path to Torture, Chose Haste Over Analysis - NYTimes.com

There was broad consensus among behavioral scientists, however, that torture did not work — subjects became so eager to stop the pain that they did not provide accurate information. And Mr. Mitchell was proposing to take techniques employed in simulations and use them for actual interrogations.

The Senate report indicates that at least some information suggesting that SERE methods were ineffective as interrogation tactics was never shared with the Justice Department. Nevertheless, the department authorized the techniques, and the C.I.A. asked Mr. Mitchell to use them.

"After a lot of soul searching, I agreed to do it," Mr. Mitchell said. "But I knew that at that moment, my life as I knew it was over. I went through my ethical obligations, and decided for me, the least worst choice was to help save American lives. It felt like something was going to happen at any minute. I felt like you had to do something."

Mr. Mitchell suggested that the C.I.A. also hire Mr. Jessen, a friend and former colleague. In the Air Force, Mr. Jessen had helped screen the instructors who posed as interrogators. Occasionally, he played the interrogator himself, and was once called out by colleagues for being too aggressive. Mr. Jessen did not respond to repeated interview requests.

In Thailand, only Mr. Mitchell and Mr. Jessen were allowed to use the new tactics. For nearly a month, they interrogated Abu Zubaydah, at one point waterboarding him until he lost consciousness. Some C.I.A. officials said they were repulsed by the brutal methods, according to the Senate report, and cables showed that some wanted out of the program. Some officials, in fact, grew to resent the contractors, complaining that they refused to listen to alternatives, the report says. "I would sometimes feel it," Mr. Mitchell said. "It was nothing ever said to me, but I could feel it sometimes."

Yet the Senate report shows that Mr. Mitchell and Mr. Jessen prevailed, backed by allies at C.I.A. headquarters, including on the agency's Bin Laden team and at the Counterterrorism Center, who believed that Abu Zubaydah — and later others — were holding back information. It eventually became difficult to distinguish between the C.I.A. and Mitchell and Jessen Associates, the Spokane, Wash.-based company they formed, according to the Senate report.

In 2005, the C.I.A. awarded the company a contract to provide interrogation services. Mr. Mitchell and Mr. Jessen hired psychologists, interrogators and security

C.I.A., on Path to Torture, Chose Haste Over Analysis - NYTimes.com                              Page 5 of 6

personnel as the program spread to secret prisons in Afghanistan, Romania, Poland and Lithuania.

By 2006, contractors made up 73 percent of the people at the C.I.A.'s Renditions and Detention Group, the office in charge of interrogations. The majority were from Mitchell and Jessen Associates, according to the report. Mr. Mitchell said the C.I.A. made it clear that they wanted him to form the company as a way to combat the high turnover. "They wanted to have people who had retired who knew the skills," he said. In one example, the chief of the C.I.A. division that supervised the interrogation program became the firm's chief operating officer when he retired.

Mitchell and Jessen Associates had one central purpose, and when President Obama shut down the interrogation program in 2009, it was over. "The company didn't last after they shut down the program," Mr. Mitchell said.

The C.I.A. terminated the contract after paying the company $81 million of a contract that could have been worth twice that much. That does not include the money Mr. Mitchell and Mr. Jessen made before 2005, when the C.I.A. paid them a daily rate.

Both men are now retired — Mr. Mitchell to Florida and Mr. Jessen to Spokane, Wash. But both have faced continuing problems from their role in the torture program, and the C.I.A. is obligated to keep paying the legal expenses of Mitchell and Jessen Associates through 2021.

Even before the Senate report, both had been publicly linked to the C.I.A.'s interrogation program, and as a result their role has been a source of controversy.

In 2010, the Texas State Board of Psychologists considered a complaint filed against Mr. Mitchell by critics who wanted his license to practice psychology revoked. The complaint was unsuccessful.

In 2012, Mr. Jessen was selected to be a bishop in the Mormon Church in Spokane, but he was forced to step down "due to concerns expressed about his past work related to interrogation techniques," a spokesman for the Mormon Church said.

Mr. Mitchell said he disagreed with the Senate committee's conclusions, although he said he was "fascinated" by the report because it has revealed things to him that he did not know. "I was just a cog in the machine," he said.

Above all, he disputes that he was in control of the interrogation program. "The idea that I was managing things and running things is not true," he said.

C.I.A., on Path to Torture, Chose ....ste Over Analysis - NYTimes.com

But, he added, "it would be a lie to say I didn't have influence."

Marilyn Garateix contributed reporting from Land O' Lakes, Fla., and Bill Loftus from Spokane, Wash.

A version of this article appears in print on December 16, 2014, on page A1 of the New York edition with the headline: C.I.A., on Path to Torture, Chose Haste Over Analysis.

© 2014 The New York Times Company

U.S. WORLD BUSINESS TECH & SCIENCE CULTURE SPORTS (
EDITION

## U.S.
# Justice: Torture Memo Fallout

BY **MICHAEL ISIKOFF** 4/5/08 AT 10:29 AM

With little advance notice, Pentagon general counsel William Haynes quietly resigned at the end of February to take a top legal job at Chevron. But Haynes, a close ally of Vice President Dick Cheney, remains a key figure in a sweeping Senate probe into allegations of abuses to detainees in Defense Department custody.

Haynes was thrust back into the spotlight last week after the disclosure of a March 2003 Justice Department memo concluding that federal laws against torture, assault and maiming would not apply to the overseas interrogation of terror suspects. Haynes requested the memo (which was written by the then Justice Department lawyer John Yoo) and he and his boss, the then Secretary of Defense Donald Rumsfeld, later used it to justify harsh interrogation practices on terror suspects at Guantánamo Bay. The memo's disclosure raises new questions about the role that Haynes and other Bush-administration lawyers played in crafting legal policies that critics say led to abuses at Abu Ghraib and elsewhere.

It's a role that the Senate Armed Services Committee, overseen by Sen. Carl Levin and its ranking Republican member, Sen. John McCain, has been quietly but aggressively scrutinizing during a two-year investigation. Two sources familiar with the probe, who asked not to be identified discussing sensitive matters, say the panel's investigators have grilled a number of key players—including Special Forces operatives and FBI agents—who were never previously questioned. The panel notified the Pentagon in early February that it wanted to question Haynes. Before receiving any response, investigators learned on Feb. 25 that Haynes was leaving for Chevron in San Francisco. "How often does somebody like that give two weeks' notice and leave town?" said one government source familiar with the sequence of events.

ADVERTISEMENT

# **EXHIBIT 2**

UNCLASSIFIED

~~TOP SECRET~~ ▓▓▓▓▓▓▓▓▓▓▓▓ ~~NOFORN~~

# Senate Select Committee on Intelligence

*Committee Study of the Central Intelligence Agency's Detention and Interrogation Program*



Foreword by Senate Select Committee on Intelligence Chairman Dianne Feinstein

Findings and Conclusions

Executive Summary

*Approved December 13, 2012*

*Updated for Release April 3, 2014*

*Declassification Revisions December 3, 2014*

~~TOP SECRET~~ ▓▓▓▓▓▓▓▓▓▓▓▓ ~~NOFORN~~

UNCLASSIFIED